FILED'08 APR 18 09:34USDC-ORP

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

THERESA GREEN,                          )
                                        )
                    Plaintiff,          )        Civil No. 07-130-JO
                                        )
        v.                              )        OPINION AND ORDER
                                        )
COMMISSIONER, SOCIAL SECURITY           )
ADMINISTRATION,                         )
                                        )
                    Defendant.          )

Tim D. Wilborn
WILBORN LAW OFFICE, P.C.
19093 S. Beavercreek Road
PMB #314
Oregon City, OR  97045

    Attorney for Plaintiff

L. Jamala Edwards
SOCIAL SECURITY ADMINISTRATION
Office of the General Counsel
701 Fifth Avenue
Suite 2900, M/S 901
Seattle, WA  98104

Neil J. Evans
UNITED STATES ATTORNEY'S OFFICE
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902

   Attorneys for Defendant

JONES, Judge:

Claimant Theresa Green seeks judicial review of a final decision of the Commissioner of

Social Security denying her application for disability insurance benefits ("DIB").

This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C.

§§ 405(g), 1383(c)(3). Following a careful review of the record, the court concludes that for the

reasons stated below, the Commissioner's decision must be reversed and remanded for an

immediate award of benefits.

## ADMINISTRATIVE HISTORY

Claimant protectively filed an application for DIB on June 24, 2003, alleging an inability

to work since October 15, 1999. The application was denied initially and on reconsideration.

Claimant requested a hearing before an Administrative Law Judge ("ALJ"). Claimant,

represented by counsel, appeared and testified at the hearing held October 18, 2005; her husband,

Norbert Green, and a vocational expert ("VE") also testified. At the hearing, the ALJ requested

that claimant undergo a consultative psychological examination. After a second, post-

examination hearing on March 15, 2006, the ALJ issued a decision on July 26, 2006, denying

claimant's application. The ALJ's decision became the final decision of the Commissioner on

November 29, 2006, when the Appeals Council declined review.

STANDARD OF REVIEW

This court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence on the record as a whole. Batson v. Comm'r of Soc. Sec., 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Tylitzki v. Shalala, 999 F.2d 1411, 1413 (9th Cir. 1993), and is "more than a scintilla, but not necessarily a preponderance" of the evidence. Connett v. Barnhart, 340 F.3d 871, 873 (9th Cir. 2003). The court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusion." Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's findings must be upheld if those findings are supported by inferences reasonably drawn from the record. Batson, 359 F.3d at 1193 (citing Gallant v. Heckler, 753 F.2d 1450, 1452-53) (9th Cir. 1984)). If the evidence supports more than one rational interpretation, the court must defer to the Commissioner's decision. Morgan v. Comm'r of Soc. Sec., 169 F.3d 595, 599 (9th Cir. 1999). The Commissioner's decision will not be reversed over errors that are harmless. Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (citing Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1990)).

SUMMARY OF THE ALJ'S FINDINGS

The ALJ first determined that claimant met the insured status requirements of the Social Security Act through December 31, 2004. The ALJ then employed the required five-step sequential evaluation to evaluate claimant's disability. See 20 C.F.R. § 404.1520.

Based upon her "careful consideration of the entire record," the ALJ first found that claimant has not been engaged in substantial gainful activity during any period relevant to the

ALJ's decision. Tr. 16. Second, the ALJ found that claimant's diabetes mellitus and obstructive

sleep apnea are severe impairments, but that her impairments, either singly or in combination, do

not meet or equal the criteria of any listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Tr. 16-17.

In the next step of the evaluation, the ALJ determined that claimant retains the residual

functional capacity ("RFC") to:

> [L]ift and carry up to 20 pounds occasionally and 10 pounds frequently; sit or
> stand and walk for up to six hours in an eight-hour workday but requires a
> sit/stand option; should never climb ladders, ropes or scaffolding; and cannot
> perform complex tasks due to a combination of medication and the diagnosis of
> obstructive sleep apnea.

Tr. 18. In making that determination, the ALJ found that claimant's statements concerning the

intensity, duration and limiting effects of her symptoms were not entirely credible. Id.

The ALJ next determined, based on the VE's testimony, that claimant cannot return to her

past relevant work. The ALJ posed a hypothetical question to the VE that included a limitation

of light work, only work that did not involve complex tasks, and work that excluded tasks

involving ropes, ladders or scaffolds. Tr. 374. In the final step of the evaluation, again based on

the VE's testimony, the ALJ found that claimant, a younger individual with a high school

education and transferable skills, could perform other jobs that exist in the national economy,

including storage facility rental clerk, surveillance system monitor, and answering service

operator. Consequently, the ALJ found that although claimant's limitations do not allow her to

perform the full range of light work, claimant was not disabled at any time through the date of

her decision under sections 216(i) and 223(d) of the Social Security Act, and denied her

application for benefits. Tr. 32.

4 - OPINION AND ORDER

STATEMENT OF FACTS

The parties are familiar with the medical and other evidence of record. I will not,
therefore, repeat the evidence except as necessary to explain my decision.

DISCUSSION

Claimant challenges the ALJ's decision on several grounds. Specifically, she asserts that
(1) the ALJ erred in finding that claimant has only two severe impairments; (2) the ALJ failed to
properly credit the opinions of Drs. Michael Harris and Nancy Maloney and had a duty to further
develop the record; (3) the ALJ wrongfully rejected the opinions of Dr. Michelle Whitehead and
failed to follow agency regulations governing the mental impairment evaluation; (4) the ALJ
improperly rejected claimant's testimony; and (5) the ALJ failed to address or sufficiently explain
her rejection of the lay witness testimony. I address these arguments in turn.

1.    The ALJ's Step Two Determination of "Severe Impairments"

At step two, the ALJ found that claimant's severe impairments consisted of diabetes
mellitus and obstructive sleep apnea, but determined that claimant's alleged fibromyalgia, chronic
pain disorder, myofascial pain syndrome and restless leg syndrome were not diagnoses supported
by objective medical evidence in the record. Claimant argues that the ALJ inappropriately
discounted the diagnoses of fibromyalgia and myofascial pain syndrome because various doctors,
including Dr. Maloney and Dr. Harris, continued to describe the claimant's condition as
"fibromyalgia," "myofascial pain," and "chronic pain syndrome." Pl. Opening Br., pp.7-8.

However, no actual fibromyalgia, myofascial pain or chronic pain syndrome diagnoses
appear in the record. While no laboratory tests exist to diagnose the presence or severity of
fibromyalgia, the syndrome typically is diagnosed by tenderness at a minimum of eleven out of

eighteen fixed locations on the body.  See Rollins v. Massanari, 261 F.3d 853, 855 (9th Cir. 2001).  As the ALJ expressed, the medical evidence does not clearly show that the claimant has fibromyalgia.  The only reference to a trigger point diagnostic test, performed by Dr. Maloney in April 2002, states that "[e]xamination of soft tissue throughout musculoskeletal system including classic trigger point areas for fibromyalgia demonstrated no areas of pain reproduction. . . . Today she does not fit criteria for fibromyalgia or myofascial pain as her predominant pain presentation."  Tr. 217-18 (emphasis added).  Further, in June 2004, Dr. David Stewart noted that "[claimant] is diffusely tender essentially everywhere that she is touched not just at the typical sites of discomfort for fibromyalgia."  Tr. 285.  These medical findings do not amount to a diagnosis; in fact, these physicians' reports negate claimant's assertion that she was diagnosed with fibromyalgia.  Therefore, the ALJ's conclusion that "the claimant's symptoms [do not] constitute a medically determinable impairment" that rises to the level of severity contemplated by 20 C.F.R. § 440.1520(c) is supported by substantial evidence on the record as a whole and is affirmed.

2.    The ALJ's Treatment of the Opinions of Drs. Harris and Maloney

Claimant next contends that the ALJ substituted her own opinions for the opinions of treating physician Dr. Harris and examining physician Dr. Maloney, and that before rejecting the doctors' opinions, the ALJ had a duty to further develop the record.

Although claimant asserts that Dr. Harris diagnosed her with fibromyalgia and myofascial pain syndrome, the record does not contain any evidence of those diagnoses.  Instead, Dr. Harris's initial consultation notes from March 2001 state that "[claimant] is felt to have possible neuropathy but apparently saw a neurologist who stated she does not have neuropathic pain, and

the possibility of fibromyalgia has at least been entertained by her husband." Tr. 227.  Nowhere does Dr. Harris indicate he actually performed a trigger point diagnostic test in an attempt to evaluate claimant for fibromyalgia.  Additionally, while Dr. Harris continued to record his impression of claimant's pain symptoms as fibromyalgia and myofascial pain, he also continued to refer to claimant's supposed restless leg syndrome.  See, e.g., Tr. 214, 248.  Yet, in April 2002, Dr. Gary Buchholz of the High Desert Sleep Disorders Laboratory specifically refuted that diagnosis.  See Tr. 204 ("Possible myoclonic disorder, unclear etiology.  Certainly, [claimant] does not describe any true restless leg syndrome.") (emphasis added).  Dr. Harris's failure to update the language in his progress reports by removing the references to restless leg syndrome following Dr. Buchholz's assessment reflects on Dr. Harris's continued use of "fibromyalgia" and "myofascial pain syndrome" in the progress notes, which remain in the record despite a lack of an actual diagnosis of either syndrome.

Similarly, claimant argues that the ALJ erroneously characterized the reports from Dr. Maloney.  Initially, claimant alleges that the ALJ's characterization of Dr. Maloney is "somewhat misleading."  Pl. Opening Br., p. 8.  However, as described above, when Dr. Maloney performed the trigger point test, claimant "demonstrated no areas of pain reproduction," which led Dr. Maloney to conclude that, on the day of the exam, claimant did "not fit criteria for fibromyalgia or myofascial pain as her predominant pain presentation."  Tr. 217, 218.  Dr. Maloney's examination is the only evidence of a diagnostic trigger point test in the record, and based upon that examination, Dr. Maloney concluded that claimant did not have fibromyalgia.  Again, the lack of an actual diagnosis in the record supports the ALJ's finding that claimant's symptoms do not constitute a medically determinable impairment.

7 - OPINION AND ORDER

Finally, claimant argues that before rejecting the physicians' opinions, the ALJ had a duty to further develop the record. However, the burden falls on the claimant to provide evidence of disability; an ALJ's duty to develop the record only applies to the extent that the record is ambiguous or is "inadequate to allow for proper evaluation of the evidence." Mayes v. Massanari, 276 F.3d 453, 459-460 (9th Cir. 2001). When applicable, the ALJ may satisfy this duty in several ways, including subpoenaing or submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record. Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).

In the present case, the record before the ALJ was neither ambiguous nor inadequate to allow for a proper evaluation of the evidence. Consisting of almost two hundred pages, the medical evidence in the record was provided by more than half a dozen medical professionals. Tr. 153-339. Because the evidence in the record was sufficient for a proper evaluation by the ALJ, the ALJ did not have a duty to independently develop the record. Further, even if the duty to develop the record had been triggered, the ALJ satisfied this duty by continuing the hearing to allow for a consultative psychological examination of the claimant, and permitting claimant's lawyer to supplement the record with updated medical records from Bend Memorial Clinic following the second hearing. See Tr. 14, 328-38. Therefore, I reject claimant's argument that the ALJ had a duty to further develop this record.

3.      The ALJ's Evaluation of Dr. Whitehead's Opinion and Compliance with Agency
        Regulations Governing Mental Impairment Evaluation.

Claimant next argues that the ALJ wrongfully rejected the opinions contained in Dr. Whitehead's consultative psychological evaluation and failed to properly comply with agency

regulations governing the evaluation of a mental impairment. Claimant contends that the ALJ "gave no reasons whatsoever for rejecting Dr. Whitehead's opinions." Pl.'s Opening Br., p. 9. However, the ALJ did not actually reject Dr. Whitehead's report; Dr. Whitehead opined that claimant has a normal mental status and while claimant's opiate-based medications resulted in a slight cognitive delay, "[s]he has an intact memory and [her] intellectual functioning is sufficient for several possible employment opportunities." Tr. 316. Further, the ALJ's opinion reveals that she considered the comprehensive psychological evaluation report and adopted Dr. Whitehead's conclusions that claimant has "a normal mental status although a slight cognitive delay due to medications was seen." Tr. 17.

Claimant also argues that the ALJ failed to properly follow the regulations governing the evaluation of mental impairments. See 20 C.F.R. § 404.1520a. Specifically, claimant argues that the ALJ failed to make a specific finding as to the degree of limitation in each of four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Id. § 404.1520a(c)(3).

Using the special technique, the ALJ must first evaluate a claimant's "pertinent symptoms, signs, and laboratory findings" to determine whether the claimant has a medically determinable mental impairment. Id. § 404.1520a(b)(1). If the ALJ finds the claimant has a medically determinable mental impairment, the ALJ must then specify those symptoms, signs, and laboratory findings that substantiate that finding, before addressing the degree of functional limitation that the impairment imposes. Id. § 404.1520a(b)(1)-(2). However, if the ALJ determines the claimant is not disabled by a medically determinable mental impairment, the analysis ends. See id. § 404.1520(a).

9 - OPINION AND ORDER

Substantial evidence in the record supports the ALJ's determination that claimant does not suffer from a medically determinable mental impairment. Because the ALJ determined that claimant's mental status is normal, further analysis was not required. Moreover, the degrees of limitation documented elsewhere in the record permit the conclusion that any mental impairment is not severe. See Tr. 261. Therefore, the ALJ's decision regarding claimant's mental status is upheld.

4.    The ALJ's Determination of Claimant's Credibility

Claimant next challenges the ALJ's finding that claimant is not entirely credible. Once the record contains medical evidence of an underlying impairment, the ALJ may not discredit claimant's testimony simply because the subjective complaints are unsupported by objective evidence. Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995). The ALJ must provide specific, cogent reasons for rejecting claimant's complaints. Id. In the absence of evidence of malingering, the ALJ may reject claimant's testimony only for clear and convincing reasons. Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006).

In the present case, because the objective medical evidence established claimant's diabetes and obstructive sleep apnea, the ALJ's credibility determination focused on claimant's testimony regarding her alleged symptoms that pertain to those medically determinable impairments. See 20 C.F.R. § 404.1529.

According to the ALJ, claimant's medically determinable impairments could be expected to produce some symptoms, but not of the intensity and duration of symptoms or the limitations they cause, as described by claimant. Tr. 18. The ALJ discounted claimant's credibility for two principal reasons. First, the ALJ found that claimant's non-compliance with a Continuous

Positive Airway Pressure ("CPAP") treatment, prescribed to treat her obstructive sleep apnea, "calls into question the severity of this condition. Compliance would also be expected to help alleviate her symptoms." Id. Second, the ALJ concluded that because claimant did not bring her insulin chart or glucose chart to her appointment with Dr. Harris in August 2003, and because in March 2006 claimant reported inconsistency with respect to proper nutrition and exercise, the claimant was not entirely credible. Tr. 18-19.

The ALJ determined that claimant is incapable of performing complex tasks due to the combination of prescribed medications and claimant's obstructive sleep apnea. Tr. 18. Claimant was initially referred to the High Desert Sleep Disorders Laboratory because of a potential restless leg syndrome diagnosis. Tr. 203. Her symptoms included "fairly violent" jerking of her legs, grinding of her teeth and an increase in nightmares, and Dr. Gary Buchholz noted that claimant was "fatigued, irritable, etc." Id. While Dr. Buchholz ruled out a restless leg syndrome diagnosis, claimant was diagnosed with "moderately severe" obstructive sleep apnea in April 2002, and was prescribed a CPAP for treatment in May 2002. Tr. 200-202. Dr. Buchholz's report from September 2002 noted that claimant initially went a couple of weeks "without using it much" but by then was using it "fairly consistently." Tr. 197. In October 2002, Dr. Harris's note states that claimant's quality of sleep had improved with the use of the CPAP. Tr. 214. Dr. Harris reported in January 2003 that claimant had not been using the CPAP; in February 2003, Dr. Harris wrote that claimant was still trying to adjust to the CPAP. Tr. 211, 212.

The ALJ found that claimant's non-compliance called into question the severity of her symptoms because "[c]ompliance would also be expected to help alleviate her symptoms." Tr. 18. Rather than undermining claimant's credibility, however, the records suggest that

11 - OPINION AND ORDER

claimant went through a period of adjustment.  Claimant's failure to strictly comply with the

CPAP prescription in the initial treatment phase is even less important in light of Dr. Buchholz's

statement that "it may take some time for this aspect of her problems to improve.  I have told

[claimant] we need to give it 6 months or a year to see how she does."  Tr. 197.  Claimant

eventually discontinued the CPAP treatment because she felt that her sleep apnea symptoms were

not improving.  See Tr. 284 (noting in June 2004, almost two years later, that claimant stopped

using the CPAP because "she does not feel it helps").  The record shows that the CPAP treatment

did not alleviate claimant's symptoms and therefore her non-compliance does not adversely

reflect on claimant's credibility regarding her symptom testimony.  Consequently, I find that the

ALJ's rationale for discounting claimant's testimony concerning her sleep apnea symptoms to be

insufficient.

Claimant's complaints regarding her diabetes and the inability to control her symptoms

are well-documented in the record.  Claimant testified that she had to leave her last job in part

because she could not control her diabetes.  Tr. 345.  She also testified that she has had so many

hypoglycemic episodes that she is no longer aware when an episode is coming on.  Tr. 352-53.

Doctors' notes throughout the record state that claimant's diabetes is very labile, hard to control,

and difficult to explain.  See Tr. 210, 212 (noting that her blood sugar levels ranged from 41 to

400), 219 (stating that claimant tends to wake up hypoglycemic in the morning), 293

(documenting claimant's history of hypoglycemic seizures), 298 (noting "this time when

[claimant's insulin] pump was not working and she had to go into the ER for an IV infusion of

insulin).

12 - OPINION AND ORDER

The ALJ relied in part on claimant's failure to bring her insulin and glucose charts to various appointments to discredit claimant's diabetes symptom testimony. Tr. 18-19. The record does show that claimant did not bring her charts to appointments and failed to keep a log of her blood sugar levels. See, e.g., Tr. 212, 223, 248. However, the record also shows that claimant regularly tests her blood sugar level six or eight times a day, Tr. 212, and claimant testified that she tests her blood sugar level every two hours, and even more frequently if she is not feeling well. Tr. 359. Therefore, whether claimant remembered to bring her insulin and glucose logs to a handful of doctors' appointments does not speak to the issue of her credibility regarding her diabetic symptoms.

Likewise, the medical evidence does not reflect that claimant's diabetes could be controlled with strict adherence to a nutrition and exercise plan, nor was the prescribed insulin pump sufficient to regulate her diabetes for any considerable length of time. Instead, the record contains statements from numerous doctors throughout the entirety of the medical record that claimant's blood sugar levels are labile and her diabetes is difficult to control.

In March 2002, Dr. Harris noted that claimant's "blood sugars are not consistently lower . . . when she does periodic exercise three times per week." Tr. 219 (emphasis added). Dr. Harris commented in December 2001 that claimant's blood sugar levels "have markedly improved with the HUMALOG/LANTUS [insulin] combination," but by June 2002 Dr. Harris documented that the Humalog stopped being effective and new insulin strategies were being considered. Tr. 216. In April 2003, Dr. Harris noted that claimant's blood sugar levels "remain very labile and very difficult to explain." Tr. 210. Agency employee Edward Opitz commented in September 2003 that claimant's diabetes was "very difficult to control [and she] is now on an

insulin pump." Tr. 240. That assessment was echoed by reviewing physicians Dr. Richard Alley

in September 2003 and Dr. Martin Kehrli in January 2004. Tr. 270. Dr. Harris reported in

February 2005 that claimant was having "much less hypoglycemic symptoms on the insulin

pump" but also noted that her "[b]lood sugars continue to be very labile." Tr. 297. Dr.

Whitehead's neuropsychological report noted that claimant has been hospitalized two or three

times because of problems controlling her insulin. Tr. 313. Dr. Harris's progress note from

March 2006 states that claimant's blood sugar levels "remain irregular [and she] has been using

glucagon at an increased rate because of this." Tr. 329.

The ALJ concluded that as of the end of 2005 claimant's diabetes was improving. The

ALJ based this conclusion on a comparison of two Hemoglobin A1c lab tests and Dr. Harris's

note that claimant's A1c levels had improved from 8.7% to 7.9%. Tr. 329. However, the ALJ's

conclusion overlooks the testimony and documentation that, during the same time period,

claimant suffered at least six major glycemic episodes requiring the use of prescription glucagons

as an antidote. See Tr. 156 (pharmacy record showing four glucagon emergency kit refills, each

containing two uses, over a three-month period), 381, 383-385 (claimant's testimony regarding

the glycemic episodes). While her overall average hemoglobin number did drop in the three-

month period between November 2005 and February 2006, that number fails to reflect individual

spikes such as the glycemic episodes claimant experienced. See Tr. 333 (Hemoglobin A1c test

results), 386-388 (explaining the relevance of the A1c number to individual glycemic episodes).

Claimant's testimony echoes the futility of her efforts to control her diabetes. At the first

hearing before the ALJ, claimant testified that, among other things, she has received instruction

in carbohydrate counting, tried dieting and exercise, and met with a physical therapist, but that

none of these attempts had successfully controlled her diabetes. Tr. 211, 352. Because the diabetes is not controlled, she tests her blood sugar levels every two hours or more, and she still has a low blood sugar count every three or four days, regardless of how strictly she had been following her schedule. Tr. 359-360. Claimant also stated that she does not experience any warning signals when her blood sugar drops because she has had too many low blood sugar incidents, and she reported that she had not done anything differently in the time leading up to the glycemic episodes that might have triggered them. Tr. 388-389.

Because the record establishes the large range of fluctuations in claimant's blood sugar levels and her inability to regulate her diabetes for an extended period of time, I find the ALJ's reasoning for discrediting claimant's diabetes testimony to be insufficient. Because the ALJ inadequately supported her reasons for discrediting claimant's symptom testimony, the ALJ's credibility determination is not sustained. The effect of this error is discussed more fully below, in Section 6.

5.    Lay Witness Testimony

Claimant argues that the ALJ did not address or otherwise provide any reasons for rejecting the testimony of claimant's husband, and that the failure to provide reasons for rejecting that testimony is reversible error.

In considering whether a claimant is disabled, the ALJ is required to consider lay testimony addressing a claimant's ability to work in light of his or her impairment. Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006). Because a lay witness is often in a position as an eyewitness to describe claimant's symptoms and activities of daily life, the ALJ may not reject the testimony of the lay witnesses without providing "reasons that are

15 - OPINION AND ORDER

germane to each witness." <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918-19 (9th Cir. 1993). When the ALJ fails to properly discuss competent lay witness testimony favorable to a claimant, a reviewing court may not consider that error harmless unless the court can conclude that no reasonable ALJ, after fully crediting the testimony, could have reached a different disability determination. <u>Stout</u>, 454 F.3d at 1056. If that failure and resulting error is not harmless, then substantial evidence will not support the Commissioner's disability determination. <u>See</u> <u>id.</u>

In the present case, the ALJ failed to address claimant's husband's testimony anywhere in her opinion. The Commissioner argues that the ALJ did address Mr. Green's testimony at the hearing, and suggests that logic leads to the conclusion that the testimony is incorporated into the ALJ's findings. <u>See</u> Def. Br., p. 6 n.2. The transcript from the second hearing does include the ALJ's statement that Mr. Green "is not totally credible in his reporting." Tr. 382. The ALJ further states that "[h]e has been a great advocate for disability and more treatment so I'm wondering is there a medical record that can support these [injections] other than just his opinion that she needs [the glucagon shot]." <u>Id.</u> However, because the ALJ's written opinion wholly fails to mention the testimony of claimant's husband, let alone provide germane reasons for rejecting his testimony, I conclude that the ALJ erred. Because I also find that the testimony, if fully credited, would lead a reasonable ALJ to make a different disability determination, I further conclude that this error was not harmless.

Mr. Green's testimony highlighted the volatility of claimant's blood sugar levels and her inability to adequately control her diabetes over the long term. Mr. Green stated that he calls claimant at least three or four times daily to inquire about her blood sugar levels and make sure she is well. Tr. 363. He testified that claimant has tried to eat healthy but that "it just makes no

rhyme, or reason, or sense, no matter what she's ever done" to try to control the diabetes. Id. According to Mr. Green, claimant followed a rigid diet when she was initially diagnosed with diabetes, but that her blood sugar levels were still "all over the chart." Id. at 367. Mr. Green also testified that the insulin pump initially seemed to help regulate claimant's blood sugars, but that "after a time, just like anything, it just began to go all over the place." Id. at 364.

Because the ALJ's opinion failed to properly address the lay witness testimony, and because if fully credited, Mr. Green's testimony would result in a different disability determination, substantial evidence does not support the Commissioner's decision that claimant can perform other relevant work based on her RFC.

6.    Remand Analysis

The analytical errors in the ALJ's discrediting of claimant's testimony and failure to address lay witness testimony requires this matter to be remanded to the Commissioner. While the court will normally remand a case for further administrative proceedings, where further proceedings would serve no useful purpose, the court may remand for an immediate award of benefits. Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004). Under the Harman test, the court should credit evidence and remand for benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) no outstanding issues must be resolved before a disability determination can be made; and (3) the record clearly establishes that, were the rejected evidence credited, the ALJ would be required to find the claimant was disabled. Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir. 2000).

In the present case, the record evidence establishes that claimant suffers from severely labile diabetes that she cannot control for any meaningful period of time. Because the ALJ's

17 - OPINION AND ORDER

formulation of claimant's RFC failed to incorporate all of her limitations, including her inability to control her diabetes, the VE's finding that claimant is capable of performing jobs that exist in the national economy, including storage facility rental clerk, surveillance system monitor, and answering service operator, has no evidentiary value.  See Tr. 374-376.

Moreover, claimant's lawyer posed an additional hypothetical to the VE, which included the ALJ's limitations and added a limitation of one diabetic episode per week, lasting approximately two hours, that would sideline claimant at unpredictable times.  Tr. 376.  With that additional limitation, the VE testified that "I don't think she could hold a full-time job with that added hypothetical."  Id.  Thus, the hypothetical posed by counsel, which encompasses all of claimant's limitations and restrictions established by the record, compels a finding that claimant is not employable, and the ALJ's step five finding is not supported by substantial evidence.

In light of the VE's testimony, based on all of claimant's established limitations that claimant is not employable, I conclude that each of the <u>Harman</u> factors is met. Therefore, this case is appropriate for a remand for an immediate award of benefits.

CONCLUSION

Based on a thorough review of the record, the Commissioner's decision denying claimant's application for DIB is not supported by substantial evidence in the record as a whole and is therefore REVERSED and REMANDED for an immediate award of benefits.

DATED this _18th_ day of April, 2008.

ROBERT E. JONES
U.S. District Judge

19 - OPINION AND ORDER